863 F.2d 1190
 1993 A.M.C. 1676
 Walter Douglas NUNLEY, et al., Plaintiffs-Appellees,
v.
M/V DAUNTLESS COLOCOTRONIS, etc., et al., Defendants-Appellees,
v.
COMBI LINES, Defendant-Appellant,
Walter Douglas NUNLEY, Plaintiff-Appellant,
v.
M/V DAUNTLESS COLOCOTRONIS, Defendant-Appellee.
ESTRELLA LEAL NAVEGACION S.A., Sea Unity-Shipping S.A., and
Assurance Foreningen Gard, Plaintiffs-Appellants
Cross-Appellees,
v.
TENNECO OIL COMPANY and United States of America,
Defendants-Cross-Plaintiffs-Appellees, Cross-Appellants,
v.
COMBI LINES (Hapag-Lloyd A.G., Holland American Lines
Freight B.V and International Transport B.V.) and its
insurer, The United Kingdom Mutual Steamship Assurance Assn
(Bermuda) Ltd., Defendants-Appellees Cross-Appellees,
and
Combi Lines (Hapag-Lloyd A.G., and the United Kingdom Mutual
Steamship Assurance Assn (Bermuda), Ltd.,
Defendants-Appellees Cross-Appellants.
 Nos. 87-3121, 87-3506.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 23, 1989.
Rehearing and Rehearing En Banc Denied Feb. 28, 1989.
 
 Lee M. Peacocke, Fred E. Salley, Jack R. Salley, New Orleans, La., for Combi Lines.
 Sheri L. Orlowitz, Atty., Debra J. Kossow, Admiralty & Shipping Section, U.S. Dept. of Justice, Washington, D.C., William F. Baity, Asst. U.S. Atty., New Orleans, La., for U.S.A.
 Hugh Ramsay Straub, L.R. DeBuys, IV, New Orleans, La., for Estrella & Sea Unity.
 Rene S. Payssee, New Orleans, La., Mendes & Mount, New York City, for Underwriters.
 Cornelius, Sartin & Murphy, Russell Cornelius, New Orleans, La., for Employers Ins. of Wausau.
 John B. Gooch, Jr., Frederick T. Haas, III, New Orleans, La., William M. Bass, Lafayette, La., for Point Landing, Inc., et al.
 Reuter, Reuter, Reuter & Pizza, New Orleans, La., for Federal Barge Lines, et al.
 G. Hamp Uzelle, III, Alex F. Lankford, III, Mobile, Ala., for Dravo.
 John E. Galloway, New Orleans, La., for Tenneco.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before THORNBERRY, KING and JONES, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 All voyages, whether uneventful or calamitous, must eventually complete their course, bringing their passengers to a final destination. To say that the journey of the M/V DAUNTLESS COLOCOTRONIS through the judicial system has been lengthy is an understatement. This case has dropped anchor before our court on two previous occasions, most recently before the court en banc. Nunley v. M/V DAUNTLESS COLOCOTRONIS, 727 F.2d 455 (5th Cir.1985) ("Nunley I"). In the interest of simplicity, we have consolidated the two sets of appeals in this matter. Today's decision should allow the M/V DAUNTLESS COLOCOTRONIS to dock and allow the parties to this suit to disembark with their disputes finally resolved.
 
 I.
 BACKGROUND
 
 2
 The journey began on the night of January 16, 1974 in the Port of New Orleans with what has been called the "Great Barge Breakaway." The district court found that during the winter of 1973-74, conditions on the Mississippi River were extremely precarious. Because of large grain shipments, high water, a longshoremen's strike, and the inaccessibility to upstream ports, over 3,000 barges were fleeted in the Port of New Orleans. Combi Line's (Combi) fleet was docked on the west bank at an approved fleeting site at a bend in the river (mile point 101.1 AHP). In all, more than 130 vessels broke from their moorings that night, cascading down the river. Combi's fleet was struck by some of these drifting barges. One of the barges torn from its moorings was Combi Line's LASH Barge CBLL-01315. Although attempts were made, as detailed below, this barge was never recovered.
 
 
 3
 Following the January 16 breakaway, a Combi representative accompanied the United States Coast Guard in a helicopter search for its missing barges. In a relatively short period of time, Combi, through several means, had located twenty of its twenty-one errant barges. The CBLL-01315, however, still remained at large. Next, Combi hired a magnetometer operator to search for the missing barge. Combi's search, which included the area of the Algiers Lock Forebay[1] and the area in front of the Tenneco Oil docks[2], used both a magnetometer and a fathometer. The search revealed an object with the characteristics of a LASH barge, 67 feet below the water surface in the vicinity of the Algiers Lock Forebay. Further searching revealed another object in the area of the Tenneco Oil dock. At its highest point, this object was covered with only 37 feet of water, thereby constituting a hazard to navigation. The size of this second object, as estimated from the nautical readings on the instruments, indicated that the object resembled a river barge. Unfortunately, weather conditions and the river stage precluded Combi from engaging a diver to go down and positively identify either object. According to the record, Combi concluded, largely from the difference in the size estimates, that the object found near the Algiers Lock Forebay was more likely to be the missing Combi barge. As this object posed no hazard to navigation, Combi never attempted to mark or raise this vessel.
 
 
 4
 Meanwhile the United States Army Corps of Engineers (COE) conducted its own fathometer search on January 17, 1974 and located an object near the left descending bank in the vicinity of the Tenneco docks at approximately mile point 88.4. The Corps requested that the U.S. Coast Guard mark the object with a buoy. According to the record, the Coast Guard did mark the object on two separate occasions in early 1974, but after the second buoy disappeared in February 1974, it discontinued marking the object.
 
 
 5
 As the district court noted, "For three and one-half years, the CBLL-01315 rested unmarked, its ownership and, after July of 1974, it [sic] exact location unknown, in the Mississippi River Channel." 661 F.Supp. 1096. The next phase of the saga occurred on July 22, 1977, when fire broke out on the M/V DAUNTLESS COLOCOTRONIS (DAUNTLESS) as it was approaching the Tenneco Oil Refinery. Investigators later determined that the DAUNTLESS had suffered some damage to her hull from an external object. A subsequent river search discovered the missing Combi barge in the area of the DAUNTLESS mishap. The district court concluded from the evidence before it, that the DAUNTLESS had struck the sunken Combi barge.
 
 
 6
 The district court found that "As a result of the collision, the bottom plating and pumping spaces of the DAUNTLESS were fractured. The pump room of the ship flooded with crude oil, a fire ignited in her engine room and fire consumed the engine room and the accommodation spaces located above it." By the evening of July 22, the United States Coast Guard had extinguished the fire aboard the DAUNTLESS.
 
 
 7
 Meanwhile during that afternoon, ChemLink contracted with the United States Coast Guard to provide equipment and manpower to remove water, slops and oil from the DAUNTLESS. ChemLink--chartered tugs, barges and pumps came alongside the DAUNTLESS later that same day, but ChemLink did not engage in any pumping at that time. That evening, dewatering began with Coast Guard equipment under the direction of Captain ter-Meulen.
 
 
 8
 On the evening of Sunday July 24, before ChemLink had begun its dewatering efforts, the DAUNTLESS began losing freeboard. The Coast Guard resumed its efforts in dewatering the ship. During Sunday evening and Monday morning, Captain Walter Nunley, vice president of ChemLink, was also engaged in securing pumps for dewatering the DAUNTLESS. Although the exact time is in dispute, at some time on Monday morning, Nunley's pumps began to contribute to the dewatering effort.
 
 
 9
 Nunley subsequently brought a salvage claim against the DAUNTLESS arguing that his dewatering efforts on the night of July 24 and the morning of July 25 were performed by him in his personal capacity, as opposed to his role as a vice president of ChemLink.
 
 
 10
 The DAUNTLESS interests (Estrella Leal Navegacion S.A., Sea Unity Shipping S.A., and Assurance Foreningen Gard) brought suit against the barge owner, Combi Line, and the barge P & I underwriter, the U.K Club, alleging that Combi was negligent in locating its barge fleet in a vulnerable position and in maintaining tier lengths exceeding those allowed by its COE permit. The DAUNTLESS interests also allege that Combi was negligent in its search for the barge, and in failing to mark or remove the barge from the river.
 
 
 11
 Combi, in turn, filed a complaint for exoneration from, or limitation of, liability. Tenneco Oil Company (Tenneco) filed a claim against Combi Line for the loss of the DAUNTLESS's cargo. The United States brought suit against Combi for its marking and removal expenses. Combi then brought in the Upriver Defendants[3] as third-party defendants to the suit under Fed.R.Civ.P. 14(c) alleging that they were at fault in the original barge breakaway. Combi also filed counter-claims against the owners of the DAUNTLESS, the United States, and Tenneco for costs, expenses, and attorneys' fees incurred in defending itself.
 
 
 12
 Prior to trial, the DAUNTLESS interests, Tenneco, the United States, and the Upriver Defendants filed motions to dismiss Combi Line's claims for indemnity and attorney's fees in accordance with Fed.R.Civ.P. 12(b)(6). The district court granted the Rule 12(b)(6) motion with respect to both the indemnity and attorney's fees claims.
 
 
 13
 With Combi's tort and contract claims still in issue, the case proceeded to trial on liability issues, with the Upriver Defendants excused. The district court found that Combi was innocent of fault in the sinking of the CBLL-01315, that it was not negligent in its subsequent search for the barge, that it reasonably concluded that the object near the Tenneco docks was not its barge, and that it was not liable for any government expenses incurred for the marking or raising of the vessel under the Rivers and Harbors Act of 1899, as amended. 33 U.S.C. Secs. 401-467. The district court also concluded that Captain Nunley was not entitled to a salvage award as he was acting at all times as a representative of ChemLink, which had contracted to dewater the DAUNTLESS.
 
 II.
 DISMISSAL OF COMBI'S INDEMNITY CLAIMS
 A. Law of the Case Doctrine
 
 14
 Combi contends that the district court improperly dismissed its claim for indemnity. Combi first argues that this court's decision in Nunley I barred the district court's dismissal under the law of the case doctrine. Combi's reading of Nunley I is incorrect. There the issue before the court was "whether under any set of facts postulated, the upriver defendants could be held liable to any of the parties for any damages resulting from the striking of the [Combi barge] by the DAUNTLESS." 727 F.2d at 466. Nunley I held that the Upriver Defendants could not be held free from fault as a matter of law. The court did not determine what theories of recovery Combi was entitled to prove and specifically avoided the issue of whether Combi might be entitled to indemnity. In fact, the Court voiced its skepticism as to that claim saying, "We do not perceive in what circumstances the owner might be entitled to indemnity.... In view of the fact that this issue has not beenbriefed, we intimate no opinion concerning it." 727 F.2d at 463.
 
 
 15
 Thus, although Nunley I refused to shield the Upriver Defendants completely from liability to Combi as a matter of law, it did not hold whether Combi was entitled to seek recovery from these parties. The district court, in granting the 12(b)(6) motion, did not deny Combi's claims for contribution and allowed Combi to proceed to trial along this theory. Therefore, the district court did not violate the "law of the case."
 
 B. Combi's Other Indemnity Claims
 
 16
 Combi next argues that the district court's 12(b)(6) dismissal was improper since it denied Combi restitution-based indemnity as a matter of law.[4] Combi contends that this dismissal was based on an inaccurate interpretation of our circuit's decisions in Loose v. Offshore Navigation, Inc., 670 F.2d 493 (5th Cir.1982), Cities Service v. Lee-Vac, Ltd., 761 F.2d 238 (5th Cir.1985), and Marathon Pipe Line v. Drilling Rig Rowan/Odessa, 761 F.2d 229 (5th Cir.1985). Our Circuit's holdings in these cases raise some questions as to the continued existence and scope of restitution-based indemnity in maritime cases. Nevertheless, we may pretermit further discussion of this issue and Combi's indemnity claim because the district court was entitled to concluded that Combi was not negligent and therefore not liable for damages incurred by the DAUNTLESS. Thus the question whether the district court erred in dismissing Combi's indemnity claim becomes moot.
 
 III.
 COMBI'S ALLEGED NEGLIGENCE
 
 17
 The DAUNTLESS interests challenge the district court's findings and conclusion that Combi was not at fault in the collision of the DAUNTLESS with the sunken Combi barge. Specifically, the DAUNTLESS interests claim that the district court erred in (1) its factual determination that Combi conducted a "good faith search" for its missing barge, (2) its determination that Combi had abandoned the barge, and (3) its finding that the great barge breakaway was an inevitable accident. We disagree.
 
 
 18
 "In maritime as in most federal actions, the 'clearly erroneous' rule applies to the review of the factual findings of the trial court." Candies Towing, Co. v. M/V B & C Eserman, 673 F.2d 91, 93 (5th Cir.1982). See also McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954) ("In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous."); Chaney v. City of Galveston, 368 F.2d 774, 776 (5th Cir.1966). A finding is clearly erroneous when although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 A. A Diligent and Good Faith Search
 
 19
 The DAUNTLESS interests contend that this circuit's decisions in Allied Chemical[5] and Nunley I require Combi to have done more in order for its actions to qualify as a good faith search. We disagree.
 
 
 20
 In Allied Chemical, the owner of a sunken vessel employed "sophisticated equipment and techniques" and began his search on the day after the apparent sinking. The owners also hired divers to search for the wreck. Like the owners in Allied, Combi began its search for its vessel the first day after the barge breakaway; a Combi representative joined a Coast Guard helicopter search for missing vessels. Combi also hired Elwood Groom, who was skilled in using magnetometers and interpreting their readings, to conduct a search using both a magnetometer and a fathometer.
 
 
 21
 The DAUNTLESS interests mistakenly contend that Combi's failure to send a diver down to identify positively the two objects found in Groom's search is inconsistent with the district court's good faith finding. It is true that no divers were sent down, but as the record clearly indicates, river conditions were too dangerous to allow their use. According to trial testimony this dangerous condition lasted into the summer of 1974, by which time Combi considered the barge abandoned.[6]
 
 
 22
 Further, our decision in Nunley I merely reiterated our position that a good faith search, such as the one conducted in Allied Chemical, could exonerate a non-negligent owner of a sunken vessel from his duties under the Wreck Act. 33 U.S.C. Sec. 409.
 
 
 23
 In fact, having read all of the DAUNTLESS interests' criticisms of the Combi search, we have found few additional actions that Combi could actually have taken.[7] The DAUNTLESS interests suggest that Combi should have conducted a more thorough follow-up on several reports of sunken objects or sightings of sinking vessels. We agree that such action would have been desirable, but it is not clear from the testimony that this additional information would have been conclusive. The Combi magnetometer and fathometer search identified two objects on the river bottom: one near the Algiers Lock Forebay and one near the Tenneco dock. According to the deposition of Combi representative Captain Plantinga, the apparent difference in size of the two objects greatly influenced Combi's determination that the object near the Algiers Forebay was most likely the Combi barge. The object near the Tenneco dock was thought to be too large to be the missing LASH barge. In contrast, the object near the Algiers Lock had dimensions more in keeping with that of a LASH barge. The district court apparently found Combi's decision as to which object was most likely to be its barge reasonable in light of the apparently different lengths.
 
 
 24
 Finally, we must remember our standard of review. In a trial that consumed weeks and many volumes of record, the district court was in the best position to evaluate Combi's efforts in locating its missing barge. Having reviewed the record in this case, we cannot say that the district court clearly erred.
 
 B. An Inevitable Accident
 
 25
 The DAUNTLESS interests fare no better in their argument that the district court inappropriately determined that the Great Barge Breakaway was a vis major, thereby precluding a finding of negligence on Combi's part for the CBLL-01315's breakaway. We agree with Combi that the breakaway is more properly classified as an "inevitable accident."[8] Nevertheless, the district court had ample evidence to support its finding.
 
 
 26
 The determination of "inevitability" is primarily a finding of fact governed by the evidence. See The Anna C. Minch, 271 F. 192 (2nd Cir.1921); Griffin, The American Law of Collision, Sec. 238 (1949). The district court found that, "The Great Barge Breakaway was unique in its magnitude. It made no distinction between barges located in riverbends and those on the straightaway, or between those moored six across and those moored directly to shore.... No fleet could have been designed to hold fast against this particular breakaway." The record thoroughly supports the court's finding. Combi's fleeting position, although in a river bend, was located at a site selected by the New Orleans Dock Board and approved by the Corps of Engineers. Many fleets were located in the bend. Even some barge fleets in the straight stretches of the Mississippi River were struck by the drifting vessels. In fact, Charlton Nettles, Chief of the Operations Division of the COE in New Orleans, testified that no fleet could be designed to ensure that its vessels would remain secure against drifting vessels from upriver.
 
 
 27
 In Dow Chemical Company v. Dixie Carriers, Inc., 463 F.2d 120 (5th Cir.1972), we held that the mere location of an object on navigable waters, in technical violation of federal statute, did not amount to negligence on the part of the owners when the object (in this case a fender system) was struck by barges. There we found that the fender system neither obstructed navigation nor was inherently dangerous, and we further found that a different design or placement of the structure could not necessarily have avoided the collisions. We said, "The record refutes any suggestion that the fender system 'caused or contributed to' the collision simply by being there." 463 F.2d at 122. Similarly, in the present case, the record indicated that the barges cascading down the Mississippi did not discriminate between barge fleet locations or tiering lengths. Charlton Nettles, a professional engineer himself, testified that a different fleeting design or placement could not have prevented uncontrolled, drifting vessels from dislodging moored vessels.
 
 
 28
 Unlike the arrival of a hurricane, the barge breakaway occurred without warning. Cf. Boudoin v. J. Ray McDermott & Company, 281 F.2d 81 (5th Cir.1960) (barge operator had ample warnings of Hurricane Audrey's approach and failed to take appropriate cautions). We are reminded that under the inevitable accident doctrine, "[T]he highest degree of care is not required. It is sufficient if the navigator has complied with the tests of ordinary prudence ..." Griffin, Sec. 238; See also The Grace Girdler, 74 U.S. (7 Wall.) 196, 203, 19 L.Ed. 113 (1879). Combi has satisfied this standard.
 
 
 29
 The DAUNTLESS interests also allege that Combi violated the terms of the COE permit by maintaining a barge tier length in excess of four barges and that this behavior constituted a "statutory violation" under the Pennsylvania Rule. The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). If this permit violation constituted a statutory violation under the Pennsylvania Rule, then Combi must prove that its violation could not have been one of the causes of the breakaway.[9] This burden of proof is extremely difficult to satisfy.
 
 
 30
 The record, however, lacks evidence to support the DAUNTLESS interests' claim that Combi violated the COE permit. Charlton Nettles testified that the COE permit would be violated only if "it was a regular practice in [the] fleet to have barges in excess of four wide" for lengthy periods of time. Nettles testified that it was common and acceptable practice for fleets to exceed the permit tier lengths for intervals of up to several hours.[10] The record is void of any evidence to show that Combi made a practice of exceeding its tier lengths for significant periods of time. In fact, the only testimony touching on this subject was provided by Anthony Valence. Valence did not indicate how often Combi exceeded the tier length or the duration of these excesses. He had worked at the Combi site for only six months prior to the breakaway. Equally important, Valence's testimony at trial was, at several points, atodds with his earlier deposition statements, and thus called his credibility into question.
 
 
 31
 The DAUNTLESS interests had the burden of proof that Combi violated a statute. Having carefully reviewed the record, we find that they have failed to meet this burden.
 
 C. Abandonment
 
 32
 In determining that Combi was free of negligence in the DAUNTLESS collision, the district court found that Combi had abandoned the CBLL-01315 prior to July 1977. Again, we must review the district court's factual finding under the clearly erroneous standard.[11]
 
 
 33
 The district court properly noted that a valid abandonment occurs through the act of deserting property without hope of recovery or intention of returning to it. See 3A Norris, Benedict on Admiralty Sec. 134 (7th ed. 1980); Bunge Corp. v. Agri-Trans Corp., 542 F.Supp. 961, 969 (N.D.Miss.1982), aff'd in part, vacated in part on other grounds, Agri-Trans Corp. v. Gladders Barge Line, Inc., 721 F.2d 1005 (5th Cir.1983). Combi and the DAUNTLESS interests quarrel over whether the Wreck Act provides that a non-negligent vessel owner can abandon his vessel by failing to act to recover it within thirty days of the sinking. We decline to hold here that a mere thirty days' inactivity on the part of a barge owner to recover his sunken vessel constitutes legal abandonment of the vessel. The statute does not support such a conclusion. Moreover, important policy reasons argue against such a rule.[12] But in this case, more than three years elapsed between the end of Combi's search for and recovery efforts towards-- its barge and the DAUNTLESS's collision near the Tenneco Oil refinery. In that interval Combi may safely be deemed to have abandoned the CBLL-01315. On February 6, 1974 Combi telexed its insurers acknowledging Combi's failure to locate the sunken vessel and declaring the CBLL-01315 a total loss. In addition, Combi notified its underwriters of the loss and stated its intention to abandon the vessel to them.[13] Nothing in the record suggests that Combi made any efforts to recover the barge after the Spring of 1974. Under these facts, we cannot conclude that the district court finding of abandonment was clearly erroneous.
 
 
 34
 The DAUNTLESS interests make much of Combi's failure to tender written notice of abandonment with the Corps of Engineers until after the DAUNTLESS accident. We agree that owners wishing to absolve themselves of further liability in connection with their sunken vessels would be wise to tender a formal letter of abandonment to the Corps of Engineers immediately after deciding to abandon. However, under current law, there is no requirement for a written notice of abandonment, and we decline to fashion such a quasi-legislative rule here.
 
 
 35
 Since Combi was a non-negligent owner and had abandoned its vessel before the DAUNTLESS collision, the district court properly found Combi to be free from negligence in the DAUNTLESS collision.
 
 IV.
 CLAIMS FOR ATTORNEYS' FEES
 
 36
 Combi alleges that it is entitled to attorneys' fees for its defensethroughout this litigation and asks this Court to find an equitable exception to the long-established American rule.[14] See Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Under the American rule, prevailing parties are not entitled to attorneys' fees except in four limited circumstances.[15] The first three of these exceptions are inapplicable to this case. As to the fourth, bad faith or oppressive litigation tactics, the record is simply bereft of any evidence of such conduct. We are unpersuaded of the need to expand the equitable exception to the American rule beyond its currently narrow scope.
 
 
 37
 Combi points to McKeithen v. S.S. FROSTA, 426 F.Supp. 307 (E.D.La.1977) for support of its position on attorneys' fees. McKeithen involved a tragic collision between a tanker and ferry in which seventy-eight commuters died and others sustained serious injury. The district court, sitting in admiralty, ordered the members of the successful plaintiff class to share the cost of the litigation, including attorneys' fees. To support its order, the court invoked the equity power vested in admiralty courts. McKeithen is therefore quite distinguishable from the case before us.
 
 
 38
 Inasmuch as Combi's legal expenses were incurred in defending its own actions against tort claims, our circuit's opinion in Odd Bergs Tankrederi A/S v. S/T GULFSPRAY, 650 F.2d 652 (5th Cir.1981, Unit B) is controlling. Odd Bergs holds that attorneys' fees are unrecoverable in contribution from other alleged tort feasors. Such fees are unrecoverable because each alleged tortfeasor is defending against claims of its own negligence, and as such, stands to benefit directly from a successful defense.
 
 V.
 THE SALVAGE CLAIM
 
 39
 A successful salvage claim requires three proofs: (1) marine peril; (2) voluntary service rendered when not required as an existing duty or from a special contract; and (3) success in whole or in part, or contribution to the success of the operation. The SABINE, 101 U.S. 384, 25 L.Ed. 982 (1880); Legnos v. The M/V OLGA JACOB, 498 F.2d 666, rehearing denied, 503 F.2d 567, 568 (5th Cir.1974). The district court cited two independent grounds for its denial of Captain Nunley's salvage claim. It found that Nunley's actions were not voluntary, but were instead part of the services which his company ChemLink had contracted to provide. It also found that Nunley's alleged salvage services "were not necessary to the removal of the ship from a condition of peril." Nunley challenges both of the district court's findings of fact. We have some difficulty with the district court's finding that the DAUNTLESS was not in peril, even though it had been sinking to a mere five inch (5") freeboard before being stabilized. We may pretermit analysis of that issue, however, because we endorse the district court's conclusion that Nunley was not a volunteer salvor.
 
 
 40
 The district court found that Nunley's actions on the night of Sunday, July 24 and the morning of July 25 fulfilled the contract he made on behalf of ChemLink the preceding Friday. That agreement, later assumed by the DAUNTLESS interests, called for ChemLink to supply barges, pumps, tugs and manpower to remove water, slop and oil from the beleaguered vessel. ChemLink was eventually paid $140,000.00 for these efforts.
 
 
 41
 Significantly, the district court credited the testimony of ship's agent George Weeks that on Friday evening he asked Nunley to secure semisubmersible pumps from Houston for the dewatering work, and Nunley promised they would arrive by Saturday, or Sunday at the latest.[16] The pumps proved unavailable. When the DAUNTLESS began sinking on Saturday, ChemLink had no pumps to contribute to the salvage effort. The Coast Guard salvage work began on Sunday evening. Weeks again asked Nunley--as a representative of ChemLink--to obtain other equipment. Nunley then obtained pumps, which started operating at about 10:30 a.m. Monday.
 
 
 42
 The parties do not dispute that from the night of Sunday July 24 through the early morning of July 25 Nunley devoted himself to assisting in the acquisition, installation or activation of several pumps for the DAUNTLESS.[17] Captain Nunley testified that although he was acting as vice president of ChemLink on Friday, Saturday and Monday, his actions on Sunday night and in the Monday dawn hours were those of an individual salvor. The district court, on the weight of the evidence, rejected his contention. We do not find its conclusion clearly erroneous.
 
 
 43
 Nunley suggests, however, that the trial court's legal analysis erred. The Supreme Court's holding in The CAMANCHE, 75 U.S. (8 Wall.) 448, 19 L.Ed. 397 (1869), he contends, approves a salvage award notwithstanding a contractual undertaking between the parties unless (1) the contract clearly covered salvage at a given sum for services rendered or (2) the agreement constituted a binding engagement to pay at all events, whether the enterprise was successful or not. The CAMANCHE does not further Nunley's salvage claim, because his actions on Sunday night and Monday morning were entirely consistent with ChemLink's agreement to dewater the DAUNTLESS. Nunley argues that ChemLink was not in the salvage business, and he testified that he told individuals connected with the Coast Guard and the DAUNTLESS just that. That the operations performed by ChemLink within the scope of its normal operations may have also had a salving effect does not mean that they exceeded the scope of ChemLink's contractual responsibility. Describing the scope of ChemLink's operations, Nunley acknowledged that the company would provide barges and pumps to pump whatever its customers wanted so long as its activities complied with Coast Guard requirements and "common sense safety practices." In the normal course of business, ChemLink would frequently rent pumps from other contractors. Nunley testified that ChemLink was responsive to the needs and demands of its customers. As vice president and general manager for ChemLink, Nunley's job required him to be on 24-hour call, and it was not unusual for Captain Nunley to go out in the field to supervise the performance of a ChemLink contract. Nunley also testified that on Friday July 22, he understood that his job would involve taking water, slop and oil out of the DAUNTLESS onto his barge. He considered himself obliged to oversee the condition of men and equipment that had been sent to the site of the DAUNTLESS during the period from July 22 through the conclusion of ChemLink's work on July 30. The distinction he seeks us to draw between his contract duties and his salvage efforts is simply too fine.
 
 
 44
 Nunley contends additionally that the case law recognizes that contract services may closely resemble, yet not constitute, salvage and cites three cases in support of this claim. These cases are readily distinguishable. In the first case, Smith v. Union Oil Company of California, 274 F.Supp. 248 (N.D.Cal.1966), the trial court found that the contract between the ship owners and the alleged salvors covered only services connected with discharging cargo and readying the ship for towing. On the other hand, the salvage efforts primarily involved firefighting and controlling the flow of sea water into the engine room. Unlike this case, these two sets of activities by the salvor are strikingly dissimilar.
 
 
 45
 Nunley's second case, Lago Oil & Transport Co. v. United States, 218 F.2d 631 (2nd Cir.1955), dealt with the salvage claims of a ship's agent. There the court said, "In the absence of any specific provision of the agency contract--and none was shown--the perilous undertakings of the night of April 13 would not constitute a part of the normal obligation of a ship's agent at a port of call." 218 F.2d at 633. The ship's agent had assisted in firefighting efforts, transported the crew of the damaged vessel to shore, and thrice attempted to tow the tanker to a safer position in the face of rough seas. In contrast, the services performed by Nunley on the evening of July 24 and morning of July 25 were precisely those activities associated with dewatering a vessel; activity which by Nunley's own account ChemLink had previously agreed to perform.
 
 
 46
 In the third case, Fort Myers Shell and Dredging Co. v. Barge NBC 512, 404 F.2d 137 (5th Cir.1968) Fort Myers agreed to meet the Tug Nellie at a sea buoy off Sanibel Island and there tow two steel barges up the Caloosahatchie River into port, delivering them to a third tug, the Leon Roddy. The price for the towing job was set at $1,000. Before the Fort Myers tug arrived, the two barges were separated from the Nellie and washed ashore on Fort Myers Beach. The Nellie ran aground farther up the coast. The court described the ensuing events as follows:
 
 
 47
 Fort Myers put watchmen on the barges and telephoned Edmonson and Edmonson's towing broker, either or both of whom requested that Fort Myers do what it could to free the barges and turn them over to the Tug Leon Roddy. According to the testimony of the two officers of Fort Myers, further conversations were had with Edmonson, the respondent Oliver, and the United States Salvage Association, each of whom said that he would see that Fort Myers would be compensated but none of whom made an explicit offer to pay.
 
 
 48
 On Saturday morning Fort Myers' tug ... proceeded down the Caloosahatchie River and, after pulling the Tug Nellie off the flats, located the two barges. The barges were positioned in tandem above the normal high water mark, parallel to the shoreline, near the remaining pilings of an old dock. For the remainder of Saturday the [Fort Myers tug] tried unsuccessfully to float the barges. On the following day she was joined by another of Fort Myers' tugs and by the Leon Roddy and after considerable effort the three succeeded in refloating both stranded vessels. The Leon Roddy towed one barge into port. Fort Myers, claiming to have received no clear promises of payment from any of the other parties, retained the other barge to secure payment of its fees.
 
 
 49
 Fort Myers, 404 F.2d at 138. Once again, these activities went significantly beyond those contemplated by the parties when the original agreement was forged.
 
 
 50
 The Lago court, in interpreting The CAMANCHE, noted that "only where the contract entered into is shown to enclose the entire undertaking, will it be a bar to recovery." 218 F.2d at 634. We agree. As has been shown, ChemLink's agreement with the DAUNTLESS fairly contemplated the efforts of Captain Nunley on Sunday evening and Monday morning. His actions were not, therefore, the voluntary conduct of a salvor.
 
 VI.
 MARKING EXPENSES
 
 51
 After the CBLL-01315 sank, the Coast Guard, in an independent search, located a sunken vessel and established a temporary buoy. On January 30, 1974 the buoy was found missing, and it was then replaced with a larger buoy. This second buoy was reported lost on February 24, 1974. At this point the Coast Guard decided to discontinue marking and advised the maritime public of its decision.
 
 
 52
 After the DAUNTLESS's accident on July 22, 1977, COE searched for an obstruction that could have contributed to the casualty. Once the wreck was located, the Coast Guard maintained a buoy on the wreck until the vessel was removed in October 1977. Upon removal, the wreck was identified as being the missing Combi barge and the same wreck which the Coast Guard had twice marked in 1974.
 
 
 53
 The United States seeks to recover $11,488.42 from Combi for its expenses in marking the Combi barge and also requests that prejudgment interest be awarded. The government's marking expenses comprise $10,388.02 for the two markings in 1974, and $1,100.40 for the marking in 1977.
 
 
 54
 The district court's decision to deny the United States its marking expenses was a conclusion of law, and as such, is subject to de novo review. Byram v. United States, 705 F.2d 1418, 1421 (5th Cir.1983). At the time of the Combi barge sinking, the Rivers and Harbors Act, 33 U.S.C. Sec. 409 (the "Wreck Act"), stated that,
 
 
 55
 ... whenever a vessel ... is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon ... and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful....
 
 
 56
 (emphasis added). This Court recently held in Nunley I:
 
 
 57
 [The Wreck Act] requires the owner of a sunken vessel, regardless of his fault or lack thereof in causing the sinking, immediately to mark the wreck.... [T]he statute places a duty on an easily determinable figure, the owner of the wreck, to ensure that the danger of the obstruction is immediately lessened by its marking or removal.
 
 
 58
 727 F.2d at 459. The Court went on to say,
 
 
 59
 ... if an owner diligently and in good faith searches for his sunken vessel but cannot find it, he has fulfilled his obligations to mark under the Wreck Act.
 
 
 60
 This latter acknowledgement does not, however, relieve a non-negligent owner from an obligation to reimburse the government for marking expenses incurred before abandonment if the government undertakes this task. In re Marine Leasing Services, Inc., 328 F.Supp. 589 (E.D.La.1971); aff'd 471 F.2d 255 (5th Cir.1973). The government's first set of marking expenses was incurred within three weeks after the sinking of the CBLL-01315. During this time, Combi cannot be considered to have abandoned the barge. As previously noted, Combi did not even inform its insurers of its intent to abandon until February 6, 1974.
 
 
 61
 The non-negligent owners' liability to the Government for its marking expenses was also established by 14 U.S.C. Sec. 86, as that statute was phrased in 1974. Section 86 authorizes the Coast Guard to mark wrecks if the owner failed to do so and states that the owner "shall be liable to the United States for the cost of such marking until such time as the obstruction is removed or its abandonment legally established...." See also 33 C.F.R. Sec. 64.01-10 (1974) ("When the District Commander within whose jurisdiction a sunken vessel is located determines that the wreck is not suitably marked by the owner for the protection of navigation, he may mark the wreck.... The costs of such marking by the Coast Guard will be charged to the owner of the wreck".).
 
 
 62
 The Government seeks reimbursement not only for its expenses incurred in the 1974 markings, but also for its marking efforts in 1977 subsequent to the DAUNTLESS wreck. The Government is not entitled to this second set of expenses. The district court found that by 1977, Combi had abandoned the sunken barge. Therefore, the Government may recover only those expenses associated with its markings in early 1974. 33 U.S.C. Sec. 409; 14 U.S.C. Sec. 86.
 
 VII.
 PREJUDGMENT INTEREST
 
 63
 Because we reverse the district court's denial of the 1974 marking expenses, we must also consider the appropriateness of awarding prejudgment interest to the United States.
 
 
 64
 The government argues, and Combi concedes, the general rule in admiralty that prejudgment interest should be awarded absent exceptional or peculiar circumstances. See e.g. Inland Oil and Transport Co. v. Ark-White Towing, 696 F.2d 321 (5th Cir.1983). "As a general rule, prejudgment interest should be awarded in admiralty cases--not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." Noritake Co. v. M/V HELLENIC CHAMPION, 627 F.2d 724, 728 (5th Cir.1980). Combi argues, however, that peculiar circumstances are present in this case.
 
 
 65
 Peculiar circumstances generally fall within three categories: (1) plaintiff's delay in bringing suit, (2) the existence of a genuine dispute regarding ultimate liability or the complexity of the factual and legal issues to be resolved, (3) judgment in an amount substantially less than that claimed. See Mecom v. Levingston Shipbuilding Co., 622 F.2d 1209, 1217 (5th Cir.1980).
 
 
 66
 Combi's first argument falls outside of these narrowly prescribed areas. Combi claims that equity dictates the denial of prejudgment interest because the United States should have sought to recover marking expenses from the Upriver Defendants instead of proceeding against Combi, the vessel owner. Combi reasons that once the district court dismissed Combi's indemnity claims, thereby precluding a possible avenue of recovery by Combi against other potentially negligent parties, the United States improperly sought to recover costs from Combi.
 
 
 67
 Although we recognized in United States v. Central Gulf Lines, Inc., 747 F.2d 315 (5th Cir.1984) that equitable considerations may, in some cases, make denial of prejudgment interest appropriate, this is not such a case. The Wreck Act requires non-negligent vessel owners to mark their vessels immediately and to maintain such marks "until the sunken craft is removed or abandoned." In Nunley I we noted the importance of placing the duty to mark on "an easily determinable figure, the owner of the wreck, to ensure that the danger of the obstruction is immediately lessened." Our decision in Marine Leasing stated our position that vessel owners--regardless of fault--are liable to the government for expenses incurred in marking the owner's vessels. Combi admits that it was aware of its obligations to the government under both the Wreck Act and our decision in Marine Leasing. There is little "equity" in Combi's behalf.
 
 
 68
 Combi next argues inexcusable delay by the United States in bringing suit against Combi. We find the government's delay entirely reasonable since it could hardly seek to recover its expenses against Combi until it had raised the vessel and identified its owner.
 
 
 69
 Combi finally contends that the government's claims for marking expenses were never asserted independently, but were stated as the total amount for marking and removal--a significantly larger amount, according to Combi. This is a frivolous argument, considering that Combi should have been able to resolve a difference of a few thousand dollars by agreement with the government rather than by undertaking years of litigation.
 
 
 70
 Finding that no peculiar circumstances exist to deny the award of prejudgment interest, we remand this matter to the district court to determine the appropriate interest rate.
 
 VIII.
 
 71
 THE DISMISSAL OF TENNECO'S CLAIM AT TENNECO'S COST
 
 
 72
 Tenneco sued Combi for damages to Tenneco's cargo as a result of the DAUNTLESS collision. In 1987, Tenneco settled its claim against Combi for $20,000.00 and so notified the district court by letter dated April 15, 1987. The June 8, 1987 judgment entered by the district court, however, dismissed Tenneco's claim against Combi at Tenneco's cost. Tenneco argues that it was the intention of both parties that in conjunction with its settlement agreement with Combi each party would bear its respective court costs. Combi does not dispute Tenneco's claim, but it requests that if this Court does alter the allocation of court costs, the amount previously allocated to Tenneco on Combi's behalf be shifted to the United States and the DAUNTLESS interests.
 
 
 73
 F.R.Civ.P. 54(d) grants the district court the discretion to allocate court costs, and therefore this Court should normally alter the district court's judgment only when it has abused its discretion. In this case, Tenneco and Combi reached a settlement that included an allocation of costs. In the absence of written reasons for its awards, we assume that the district court's assessment contrary to the parties' agreement was merely an oversight. We therefore vacate this award and remand for a re-allocation in accordance with the parties' settlement. For the reasons previously stated in denying Combi's attorney fee claim, we decline to impose Combi's costs on other parties.
 
 SUMMARY
 
 74
 In summary, we affirm the district court's conclusion that the Combi Line was not at fault in the DAUNTLESS accident. We dismiss Combi's claims for indemnity and attorneys fees. We affirm the district court's denial of Captain Nunley's salvage claim. We reverse the district court's denial of marking expenses to the United States for those expenses incurred in the 1974 markings. We remand this claim to the district court for the proper calculation of prejudgment interest. We also remand Tenneco's claim for costs consistent with the above discussion.
 
 
 75
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 [1]
 This location was selected after Combi received a report from one of the tugboat captains who participated in the general search for missing barges, that he had observed what appeared to be a LASH barge going down in the vicinity of the Algiers Lock Forebay on January 16, 1974
 
 
 [2]
 The testimony is in conflict as to whether Plantinga expected to find another wreck. Elwood Groom, Combi's magnetometer expert, testified at trial that after locating the first object near the Algiers Forebay, he and Plantinga began to search using a grid pattern technique. Such a response would seem quite natural. Groom's earlier deposition testimony, however, indicates that Captain Plantinga had received information of another barge sinking in this area
 
 
 [3]
 The Upriver Defendants included Point Landing, Inc., Zito Fleeting, Inc., Zito Towing, Inc., Lykes Brothers Steamship Co., Federal Barge Lines, Inc., Union Mechling Corp., Midland Enterprises, Inc., Admiral River Towing Co., Inc., and their insurers and underwriters
 
 
 [4]
 Combi also asserted a right to contractual indemnity against Point Landing, Inc. presumably under two distinct theories: (1) existence of a special relationship with Point Landing of the kind described in Cities Service Co. v. Lee-Vac, Ltd., 761 F.2d 238 (5th Cir.1985), and (2) existence of an implied warranty of workmanlike performance. As we note below, further consideration of these arguments is unnecessary
 
 
 [5]
 Allied Chemical Corp. v. Hess Tankship Co. of Del., 661 F.2d 1044 (5th Cir.1981)
 
 
 [6]
 The DAUNTLESS interests also insist that Combi could have sent a diver down to identify the sunken object in the low water periods of 1975 and 1976. This argument is unpersuasive to indicate negligence, however, since as we discuss later, Combi had abandoned its vessel by that time. Furthermore, by 1975 neither the Coast Guard nor COE could locate the wreck. Thus it appears that divers would have been unable to find the object to make an identification
 
 
 [7]
 The DAUNTLESS interests cite Combi's failure to mark the wreck as indicative of failure to conduct a good faith search. Combi, however, believed its wreck was the object found on the right descending bank under 67 feet of water. At that depth the object posed no danger to navigation, and marking was therefore unnecessary
 
 
 [8]
 A vis major is a species of inevitable accident that represents a natural cause of an accident, as opposed to the man-made barges and actions of the Upriver Defendants which caused an "inevitable accident" to Combi
 
 
 [9]
 We shall assume, without deciding, that a violation of the COE permit constitutes a "statutory violation" under the Pennsylvania Rule
 
 
 [10]
 Q: When you say, "very temporarily," would you consider--are you talking about a situation of a few minutes duration or what?
 A: No. I'm talking about hours as opposed to days.
 
 
 [11]
 Whether a sunken wreck has been abandoned is a question of fact. Bunge Corp. v. Agri-Trans Corp., 542 F.Supp. 961, 969 (N.D.Miss.1982), aff'd in part, vacated in part on other grounds 721 F.2d 1005 (5th Cir.1983)
 
 
 [12]
 Interpreting the Wreck Act to provide that 30 days of inactivity on the part of a non-negligent wreck owner constitutes legal abandonment removes the owner's incentive to mark or remove dangerous obstructions in navigable waters if the cost of such efforts does not exceed the salvage value of the vessel and if the owner is willing to gamble that no vessel will collide with the sunken property during the first 30 days. All the while, the government may not even be aware that the hazard exists. In such a situation, no party would be endeavoring to act responsibly toward the sunken vessel. Such a result is contrary to the purpose behind the Rivers and Harbor Act to provide safe, navigable waters. At the very minimum, the government ought to be placed on notice that the owner has lost a vessel which he does not intend to mark or raise
 
 
 [13]
 Combi's underwriters refused to accept the abandonment. They were entitled to do so, and therefore their liability is not in dispute
 
 
 [14]
 In its first brief challenging the district court's dismissal of its indemnity and attorneys' fees claims, Combi argued that it was entitled to attorneys' fees as part of its indemnity claim, citing our court's decision in Cotten v. Two "R" Drilling Co., Inc., 508 F.2d 669 (5th Cir.1975). We have declined to reach the merits of Combi's indemnity claim, finding this claim moot in light of our affirmance of the district court's finding that Combi was not negligent. Since we have not reached the indemnity issue, an award of attorneys' fees, as an element of the indemnity recovery, would be improper. This reasoning applies to Combi's claim to the indemnity and attorneys' fees under the implied warranty of workmanlike performance theory as well
 
 
 [15]
 The four exceptions as presented in Alyeska are: (1) instances where the parties have elected otherwise by enforceable contract, (2) instances where Congress has made an express statutory exception, (3) instances where the prevailing party has preserved or recovered a fund for the benefit of others as well as himself, and (4) instances in which a party has acted in bad faith or willfully disobeyed a court order
 
 
 [16]
 Weeks version of the Friday evening conversation is also corroborated by Nunley's deposition testimony which shows that during Nunley's conversation with Weeks on Sunday night regarding Weeks request that ChemLink obtain more pumps for dewatering, Nunley himself considered Weeks's request to be directed toward him in his capacity as general manager of ChemLink
 
 
 [17]
 Some reference is made to Nunley's efforts to monitor the level of explosive gasses in the engine room. Nunley's testimony indicates, however, that this activity is commonly required when attempting to pump mixtures containing oil from poorly ventilated areas