**PORT TACK SAILBOATS, INC., individually and f/u/a/b of Aetna Insurance Company and Aetna Insurance Company as assignee of Port Tack Sailboats**

v.

**UNITED STATES of America.**

**No. 82–6336–Civ–NCR.**

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

June 29, 1984.

writing class. In brief, plaintiffs, owner of a sailboat and the owner's insurer, seek damages suffered by plaintiff's brand-new 39-foot Mariner sailboat. The boat was stolen by an employee of the owner and the employee sailed it into the Gulfstream east of Fort Lauderdale; at some point in time he hanged himself from the mast. The boat drifted inexorably northward in the Gulfstream toward Cape Canaveral where its course crossed that of the polaris submarine USS WOODROW WILSON (SSBN 624).

The submarine first investigated the sailboat, then brought it alongside to pump the sailboat as dry as possible and to preserve the possible crime scene. After pumping it virtually dry, the sailboat was cut loose by the sub, which then called the Coast Guard. During the pumping operation, the sailboat smashed repeatedly into the side of the submarine. The Coast Guard towed the boat into port and, after an investigation by the F.B.I., the boat was subsequently turned over to the owner's representative.

Plaintiff[1] seeks recovery under four different theories:

(1) the submarine collided with the sailboat causing the damage,

(2) the Navy's salvage efforts in bringing the sailboat alongside and in pumping it out while the sailboat was repeatedly bumping into and grinding along the submarine's pressure hull were negligently performed,

(3) the Navy should have called the Coast Guard in the first place and the delay in doing so resulted in the damage to the sailboat,

(4) the Coast Guard allowed the boat to submerge even further after they towed the boat back to the Coast Guard station, thereby aggravating the existing damage.

Not surprisingly, defendant government has counterclaimed for a salvage lien for the efforts expended by the Navy.[2]

William H. Stolberg, Fort Lauderdale, Fla., for Port Tack Sailboats, Inc.

Ron FitzGerald and Carl W. Taylor, Fort Lauderdale, Fla., for Aetna Ins. Co.

Robert A. Rosenberg, Asst. U.S. Atty., Miami, Fla., William Duncan, U.S. Coast Guard, Washington, D.C., for defendant.

ROETTGER, District Judge.

The evidence in this admiralty case presents a script that might have been penned by the most fertile mind in a creative

---

1. Plaintiffs will be referred to in the singular.

2. Traditionally, United States Coast Guard provides rescue services pursuant to its statutory mission and does not act therefore as a volun-

## THE FACTS

Plaintiff Port Tack Sailboats, Inc. is a dealer in sailboats located in Fort Lauderdale, the Atlantic coast center for sailboat sales. The sailboat in question was a 39-foot Mariner and was the most expensive boat plaintiff had in its inventory, with a sales price of $130,000. The boat was a single masted, sloop-rigged vessel with a cabin forward and aft of its center cockpit.

Virtually no evidence was introduced about the unnamed employee who stole the boat other than that he was "troubled". The boat was last seen at its berth alongside Cordoba Road near Lauderdale Yacht Club on Thursday evening, August 20, 1981. The berth was empty when the plaintiff-owner looked for the boat on Friday. No evidence was introduced to pinpoint the time of death, except there was no dispute that his death resulted from hanging.

The evidence scene shifts northward to 35 miles off Cape Canaveral on the afternoon of Saturday, August 22, 1981, where the polaris submarine USS WOODROW WILSON is outbound for an undisclosed mission. Lieutenant Commander (LCDR) Wallace, engineering officer of the submarine, was on the bridge and at about 1500 hours was the first to see the sailboat. The boat was at a range of 14,000 yards. For better visibility, LCDR Wallace observed the boat through the submarine's periscope and could see the sailboat was heavily down by the bow; the sub's commanding officer decided to close the range to 4,000 yards. The submarine tried to hail the boat and even sounded the sub's whistle but naturally there was no response from the sailboat.

The submarine watched the sailboat for some time and noticed that the sailboat's actions were erratic, but basically sailing a circuitous course; further, it seemed to be settling in the water. A decision was made by the captain to send over a life raft (naturally, a submarine has no lifeboat) to determine what was wrong and to effect a rescue. The weather and seas were getting progressively worse; when the life raft, which had to be launched on the starboard side of the submarine because it has no portside ladder, rounded the bow of the submarine, its five occupants [3] could see the sub's torpedo tubes, which are normally six feet below the waterline.

LCDR Wallace estimated seas at 10 to 12 feet from trough to crest and described them as long rollers. It took the raft's crew nearly 45 minutes to close the 1,000 yard range to the sailboat and intercept it in its erratic course.

Not until LCDR Wallace went aboard did they discover the lone sailor, whose corpse had slumped below the top of the cockpit. When the crew first went aboard the sailboat, they found only the jib sail up and the wheel lashed hard to one side. Water was in the forward cabin to a depth of about four-and-a-half feet, up to the buttons on Chief Smith's shirt pocket. The raft communicated with the submarine and advised the captain of the lone, grisly crew member (described as "green" and "smelling") together with the fact that the boat's cabin had several feet of water in it.

The submarine wanted to preserve the possible crime scene and directed them to

---

teer. 14 U.S.C. § 88, BENEDICT ON ADMIRALTY Vol. 3A, § 59 (7th Ed. 1980); Gilmore and Black, THE LAW OF ADMIRALTY, 540 (2d Ed.); *Beach Salvage Corp. of Florida v. The Captain Tom,* 201 F.Supp. 479 (S.D.Fla.1961); THE LYMAN M. LAW, 122 F. 816 (D.Me.1903). However, Fifth Circuit Court of Appeals specifically pointed out that the Coast Guard is not barred from salvage claims for its own services and supplies in *United States v. American Oil Co.,* 417 F.2d 164 (5th Cir.1969), *cert. denied,* 397 U.S. 1036, 90 S.Ct. 1353, 25 L.Ed.2d 647 (1970) however, the language of the Fifth Circuit was completely dictum as the government made a salvage claim for expenses incurred by the Navy and Air Force in airlifting fire fighting foam to a fire in the Houston Port Canal with the action taking place under the direction of the Coast Guard. However, the Coast Guard made no claim for its services, apparently in keeping with its long standing policy of not seeking an award.

**3.** The five occupants were: LCDR Addison, LCDR Wallace, MMCS(SS) Smith, HMC Miller and EMFN Young.

bring the sailboat back to the submarine so that it could be pumped out. Only the jib was up and it was used to sail the sailboat back to the submarine. Steerage was not difficult in approaching the submarine, which was underway with no way on, until the sailboat arrived in the lee of the sub. Then the boat lost steerage way when the jib lost the wind; consequently, the boat hit the sub at a 30 degree angle on the starboard side of the bow.

The submarine's pump [4] was powered by electrical power and the operation began to pump the sailboat as dry as possible (or "de-water it" in the language used in the evidence). The seas had worsened so that the deck of the sailboat would vary from being 14 feet below the missile platform deck of the submarine and then it would rise to within two feet of the platform deck. During the three hours it took to pump out the boat, the sailboat came in contact with the pressure hull of the submarine approximately every three minutes with the impact varying from "slight scrapes to pretty good hits". After the boat was pumped out, the boarding party made an inspection but could find no reason for the incoming water. Chief Machinists Mate (MMC) Smith attempted several times to start the boat engine but could not start it.

The crew of the raft found their work extremely hazardous as well as disagreeable in some ways. Chief Smith was injured by being thrown across the boat. Three of the personnel were almost swept or knocked over the side by the jib. The jib sail was lowered when they returned to the submarine for safety reasons. In addition, the pumping was done by lowering a 150-pound pump by lanyard, but it was too big to get into the sailboat so it had to hang above the boat with a collapsible hose attached. The pumping operation would frequently have to stop because bits of carpet and other debris, frequently including the corpse itself, would be sucked into the pump. In order to keep the pump clear Chief Smith had to station himself by the pump and spent much of the time with the corpse in his lap.

### COAST GUARD TO THE RESCUE (SALVAGE)

For 24 hours each weekend the Port Canaveral Coast Guard station is essentially manned by rotating the units from the local Coast Guard Reserve division. A skeleton crew of active duty personnel are also on duty at that time.

At 2200 on Saturday evening, 22 August 1981, Port Canaveral Coast Guard station received a call from the Group Command in Mayport, Florida, as to availability of its rescue vessels and the Port Canaveral Coast Guard station advised they had a 41 footer available. At 2225 (all times set forth are in Eastern Daylight Time) the submarine WOODROW WILSON called the Coast Guard station and identified itself only as a naval unit east of Port Canaveral.

At 2241 the 41-foot Coast Guard rescue vessel # 41429 put to sea and at about 0100, 23 August, the rescue vessel made contact with the submarine and the sailboat. The precise messages transmitted by the submarine during the period of time are not clear from the evidence.[5]

The court finds that the submarine did not collide with the sailboat and the court

---

**4.** The submarine had only this pump available for the pumping out of the sailboat. There was no portable gasoline-powered pump on board; no "handy-billy" or P–500 familiar to Navymen in the past was available for use.

**5.** BM2 Donahue (boatswain's mate, second class) was the coxswain of the rescue vessel and although he indicated in his deposition he heard the submarine say "we have collided with a sailboat", he did not adhere to that during the trial; master technician first class Sammit never heard the word collision at any time but heard the submarine say to the rescue vessel # 41429 that the "black marks you see on the side of the vessel are the result of my maneuvering next to a vessel to put people on board". Chief Petty Officer Frye of the Coast Guard Reserve, who has been a boatswain's mate for more than thirty years in the Coast Guard Reserve, heard the submarine advise the rescue vessel "be advised that I put black marks on the side".

further finds that the radio transmissions do not indicate an admission on the part of the submarine skipper that he collided with the sailboat or that he attempted to maneuver the submarine alongside the sailboat.

In every profession or occupation there is a certain nomenclature which develops and nowhere is it more true than at sea, particularly in the Navy. The evidence about the submarine's skipper "maneuvering alongside the sailboat" was taken from the Coast Guard station's log. However, the station's log is not a verbatim copy of the transmission received and the overall language is not in a style which the court would expect from a submarine skipper.[6]

The one consistent thread among all of the testimony about the submarine's communication when the Coast Guard vessel arrived indicates the submarine is responsible for the black marks on the side of the vessel and the evidence is quite clear they were placed there during the pumping out or "de-watering" operation. When the Coast Guard 41-footer arrived, it never touched the sailboat but made a 90 degree approach to get only close enough to have two men step over from the bow. Their efforts to tow the boat with a tow line after lashing the rudder were to no avail as the tow kept drifting to starboard. Consequently, Chief Frye and Petty Officer Smith went aboard and fastened a bridle under the sailboat so it was being towed from the keel in an effort to lift the bow. At that time, there were two-and-one-half feet of water at the base of the ladder, although the pumping operation alongside the submarine had virtually "de-watered" the boat.

The depth of the water increased as they towed the boat to shore and after 45 minutes the persons aboard the towed sailboat called the cutter and said that they "had to pump it out or it's going down." They requested the cutter to call Port Canaveral and get them to relay this message to Mayport. Mayport had previously refused permission to pump and now approved the pumping only after receiving an affirmative reply to their inquiry about whether the pumping operation could be carried on without disturbing the cabin.

The F.B.I. was there about the time the boat was returned to Cape Canaveral Coast Guard station at 0700 Sunday morning, 23 August; the Bureau began taking statements before the corpse was removed from the boat. Chief Frye noticed the boat was taking on additional water after it was in port and turned the seacock valve one-quarter turn to close it. The evidence revealed the seacock valve only opens one-quarter turn so it was completely open at that time.

The official Coast Guard log shows "seas calm, wind east-northeast, 6 knots, 2 to 3 foot seas with swells and visibility 2 to 3 miles". The Coast Guard personnel on the cutter consistently describe the seas as two to three feet in what they remember as a very dark night. The Coast Guardsmen aboard the 41-footer went through several rainstorms and the sea was rougher at those times. From all the evidence, especially the exposed torpedo tubes, the court concludes the seas were stronger at the time of the sub's salvage operation because of local storms than reflected in the official Coast Guard log. The much higher seas testified to by the submarine's raft crew possibly resulted from their unfamiliarity with seas from an open raft.

POST–SALVAGE CHRONOLOGY

Plaintiff was advised on Monday, the 24th, of the boat's temporary custody at the Port Canaveral Coast Guard station. Because of the inherent federal jurisdiction of crimes on the high seas, the matter was investigated by the Federal Bureau of Investigation and outside parties were excluded from the vessel until the 29th of August. On that date a marine surveyor examined it for the owner's insurer, Aetna.

---

**6.** The court's own experience has been helpful in understanding the various testimonial evidence in the case: Three years' active duty at sea as a naval officer, including one year in a submarine tender with the balance in a destroyer escort. In addition, the court served twenty years in the Naval Reserve, retiring with the rank of Captain (SC) USNR.

At that time the boat was tied alongside a dock at the Coast Guard station and the surveyor believed the waterline was two or three feet high in the salon cabin.

Sometime in late September or in October the employee of Port Tack Sailboats who had originally commissioned the 39-foot Mariner for the owner examined the boat at the Port Canaveral Marina, the private marina to which the boat was released on September 15th. At that time the boat was sitting on its keel with jackstands port and starboard for additional support on the boat. His testimony was that there was a hole in the boat hull well below the waterline, so low that it couldn't be from a typical collision and he felt it had to be from an impact and not from grinding motion; further, that the force of the impact would have come from underneath the boat. The hole essentially was a crack, but a large one which would let a lot of water into a vessel, causing the boat to sink fairly rapidly without continuous pumping.

This prompted the first inspector, from a highly respected marine surveying firm, to return to the boat on October 30th because of the disparity between his first report and the report of the plaintiff's employee. This time the surveyor found the waterline five-and-one-half feet high in the main salon and additional damage to the vessel. That difference in waterlines is the basis for plaintiff's fourth claim of recovery.

Nothing further happened during this period of time at Cape Canaveral Marina except the owner sued its insurer, Aetna, in state court and eventually settled the matter.

Not until mid-January 1982 did anything further happen when a joint survey was made by Mr. Cogswell, the builder of the 39-foot sailboat, and another member of the original surveying firm. The builder felt the boat was not properly on the poppets in the Port Canaveral Marina and that the keel was not on the ground, resulting in nearly all the weight being on the poppets or jackstands under the hull. He found the oil slick inside went up to the shearline of the vessel although his written report indicated a waterline one foot below the shearline and that the waterline was four-and-one-half feet above the sole of the salon. He found a hole punched into the hull on the starboard side just above black marks on the starboard side and an inch or so above the waterline.

The third survey, done that same day by another member of the original surveying firm, found that the vessel was watertight except for the starboard side, although the keel had separated from the bottom and some intrusion of water might have occurred there. He noted that the jib was still in good shape and the Bimini top was still intact so any storm damage or rough seas through which the sailboat travelled had to be rather slight. (Note: Hurricane Dennis had traversed the general area a day or so before the submarine sighted the sailboat.)

In February, 1982 plaintiff had decided to repair the sailboat itself and all they asked Port Canaveral Marina to do was to hot-patch the hole in the hull; the boat did not leak on the trip back to Fort Lauderdale.

Although some differences in testimony and evidence throughout the trial are expectable, even among very credible witnesses, there were many in this case; still, they all seemed to be understandable differences with one exception: Port Canaveral Marina indicated they picked up the boat by means of a sling and hauled it out of the Coast Guard station slip and away to their marina nearby.

BMC Hawthorne (chief boatswain's mate) is the Coast Guard officer-in-charge of the Port Canaveral Coast Guard station. He had made several calls to get Port Canaveral Marina to remove the boat and Port Canaveral Marina's personnel arrived at the Coast Guard station on 15 September 1981. On 15 September Chief Hawthorne threw the lines from the pier over to the sailboat and Port Canaveral Marina towed it away behind its 16-foot Boston whaler. Later that night, about 0200, Chief Hawthorne received a telephone call from his officer-of-the-deck at the station

and he responded that "he would not lend a pump to Port Canaveral Marina".

Further, BM2 Donahue had been on liberty for two days and noticed upon his return to duty that the "boat with the dead man" was gone from its usual berth. That same evening (Sept. 15) he saw it tied up starboard-side to the seawall in Port Canaveral Marina.

The court finds the testimony of the Coast Guard personnel in this matter credible vis-a-vis that of Port Canaveral Marina's and it is accepted by the court. In addition, the testimony of the surveyor's first inspection indicated the boat was released by the Coast Guard on the 15th although it was not hauled by Port Canaveral until 17 September.

## REPAIRS AND SALE OF THE VESSEL

The vessel was repaired by plaintiff for $37,000 and the boat was sold then for $78,000. It previously had been listed for a $130,000 sale price, with a cost price at the time of $97,000. The boat had been listed for sale since February 1981 but had not been sold nor was it under contract for sale at the time of its theft on 20 August 1981.

## CLAIMS OF PLAINTIFF

Plaintiff presents four theories of recovery against the government:

(1) that the submarine USS WOODROW WILSON negligently collided with plaintiff's sailboat either while submerged or in attempting to come alongside the sailboat;

(2) that the polaris submarine was negligent in its salvage effort so that the vessel was damaged by the continuous impact and grinding during the pumping operation alongside the polaris submarine.

(3) that the Navy's decision to effect a rescue/salvage effort was negligence because the submarine should have called the Coast Guard immediately,

(4) the Coast Guard negligently allowed the vessel to be submerged to a deeper extent by failing to monitor the pumping operations at the Coast Guard station.

Plaintiff-owner seeks damages for losses it claims in excess of the $65,000 paid it by its insurer, Aetna. Aetna, or course, seeks recovery of its subrogation claim for the $65,000 paid to the owner, Port Tack Sailboats, Inc.

The defendant-government predictably sued for a counterclaim for a salvor's lien for the salvage carried out by the Navy. The Coast Guard has not sought a salvor's lien.

## CONCLUSIONS OF LAW

### Plaintiff's First Claim:

■ The court concludes that plaintiff has fallen far short of its burden of proving that there was a collision between the submarine WOODROW WILSON while submerged or while attempting to come alongside the sailboat. His claim apparently resulted from the opinion of plaintiff-owner's employee that there was a hole at the bottom of the vessel which must have resulted from a hard collision with a submerged object. Submerged hazards to navigation not existing in large numbers in the Gulfstream, plaintiff apparently concluded it must have resulted from a collision with the Navy vessel which happened to be submersible. Not only does the evidence fall far short of establishing such collision, but even a moment's consideration of the action of the pressure wave of a submerged polaris submarine vis-a-vis a vessel as light as the sailboat, by comparison, shows the claim to be totally lacking in merit.

There was some evidence of the sailboat bumping into the submarine at about a 30-degree angle when it was sailed back in order to begin the pumping-out operation. The result of that impact at a 30-degree angle when the jib lost the wind and the sailboat consequently lost steerage, did bend the rail of the sailboat but it did not cause the hull damage complained of. However, that minor damage was quite reasonable under the circumstances of

bringing the boat back to begin the pumping process. In fact, sailing the boat back to the sub was quite prudent compared with the unused alternative of trying to maneuver the sub alongside the boat.

*Plaintiff's Second Claim:*

The plaintiff's second claim that the submarine was negligent in the rescue salvage effort so that the vessel was damaged by the continuous impact and grinding during the pumping operation alongside the Polaris submarine presents considerably more evidence in its support.

■ Despite the use of fenders by the sub, the pumping out procedure was accomplished at some expense to the sailboat. To be sure, it was accomplished also at considerable effort and risk on the part of the crew members on board the sailboat. The law is well settled in this area. Salvage, when assumed, may not be performed with impunity, if performed negligently. *Noah's Ark v. Bentley & Felton Corp.*, 292 F.2d 437, 439 (5th Cir.1961); *The Cape Race*, 18 F.2d 79 (2d Cir.1927).

■ However, the decision of the captain of the submarine to continue pumping in an effort to "de-water" the sailboat in view of the fact it had been observed settling by the bow as well as to preserve the possible crime scene cannot be held to be a matter of negligence, considering all the circumstances. The salvage effort by the submarine was a good-faith effort and performed at considerable risk and inconvenience to its personnel so that it could turn over a pumped-out bouyant sailboat to the Coast Guard upon its arrival. The court must therefore deny plaintiff's claim under its second theory of recovery.

*Plaintiff's Third Claim:*

■ The third claim of plaintiff that the Navy's decision to effect a rescue/salvage effort was negligent because the submarine should have called the Coast Guard immediately raises several interesting points. First, at the time of the initial sighting of the sailboat (1500 hours) the sailboat was sailing in a circuitous route,

failing to respond to hailing by the submarine, was heavily down by the bow, and appeared to be settling further. Under these conditions, it seems impossible to indulge in hindsight and fault the command decision of the submarine skipper to send over a raft to find out what was wrong and render whatever rescue assistance was necessary or possible. To be sure, of the vessels known to the navies of the world, a ballistic missile submarine may be the most ill-suited and least-equipped vessel to perform any kind of a salvage operation.

Plaintiff has suggested in its brief that all this was just a lark for the submarine's personnel, a diversion from boredom at sea. However, the court notes that the submarine was outbound from Cape Canaveral only 35 miles away and boredom had hardly had time to set in. Certainly the court cannot find from the evidence that the decision to send over the raft and not call the Coast Guard at that point in time was negligence.

However, after the situation of the sailboat was more completely known to the submarine skipper and the decision was made, either by the commanding officer of the WOODROW WILSON or by someone higher in the chain of command, to "preserve the crime scene" and pump out the vessel—whether that was negligence in the failure to call the Coast Guard located only 35 miles away, either (1) at the time of sailing the sailboat back to the submarine or (2) at the time of beginning the pumping out process of the sailboat back at the submarine, presents an entirely different question.

As we have seen from the evidence, the Coast Guard vessel received the call from the Navy at 2225 hours after it had completed its pumping out operation, departed Mayport at 2241 hours and arrived on the scene with the submarine at about 0100 hours. The transit time for the Coast Guard vessel was about the same as it took to pump out the sailboat. Although the Navy did not know how long it would take to pump out the sailboat at the time it made its decision, one must wonder what

did the Navy expect to do with the sailboat once it was pumped out? Certainly, it could not station a crew on it and sail it back to Mayport when the submarine was outbound on a secret mission.

On the other hand, would the sailboat have survived if the Navy had not performed a pumping out process at the submarine? From all of the evidence, the court must conclude the likelihood of the sailboat's remaining afloat is highly conjectural. But it underscores the finding of no negligence on the part of the submarine for its action during the pumping-out process in utilizing the best method available in an effort to achieve the "de-watering".

■ Which brings us back to the question under plaintiff's third claim of recovery: Even if it wasn't negligence to fail to call the Coast Guard at the time of the initial sighting of the sailboat or the time of the decision to sail the sailboat back to the submarine for pumping out, was it not negligence in its salvage effort to fail to call the Coast Guard at the time of beginning the pumping out process—or at least within a few minutes after it could be seen what the pumping out process was going to entail in terms of the repeated grinding effort of the submarine's pressure hull against the sailboat?

The court concludes that failure at that point in time was negligence by the Navy because the Coast Guard should have been summoned no later than then.

*Plaintiff's Fourth Claim:*

■ The evidence as to the post salvage damage falls far short of establishing either that there was a "second sinking" of the vessel or that it was the responsibility of the Coast Guard; consequently, plaintiff's fourth theory of recovery must fail totally.

## NAVY'S COUNTERCLAIM FOR SALVAGE

■ The action of the Navy, despite the court's finding that the Navy should have called the Coast Guard sooner, would support the award of a salvor's lien to the Navy. Although pumping was resorted to by the Coast Guard in its tow back to Port Canaveral, the facts remain that the Navy made a considerable effort to salvage the sailboat. It was in a sinking condition at the time of its being sighted by the sub and needed to be pumped out. At considerable hazard to its personnel, as detailed in the facts, the submarine "de-watered" it.

The court is not unmindful of the obligation of a salvor to perform its task of salvage with care and not to leave the derelict in worse condition than it would have been without salvage; however, the Navy's efforts deserve a salvor's lien under these facts.

■ However, the Navy has proved no damages suffered by it other than the loss of the rubber raft which was used, unintentionally, as a fender between the sailboat and the hull of the submarine. However, there was no competent evidence as to the value of the raft. No other value with reference to damages was offered.

## THE MEASURE OF DAMAGES

The Court has found that at a certain point in time the Navy became negligent in not summoning the Coast Guard.

■ However, the evidence militates against any award of damages: The sub had to pump out the sailboat because it was sinking. Even if the submarine had called the Coast Guard at the time it commenced its pumping or "de-watering" operation, the hull damage complained of would still have occurred in the time necessary for the Coast Guard Cutter to have arrived on the scene. The only thing that would have resulted would have been that the tow to port would have commenced about two hours earlier possibly before the boat took on additional water in the interim between being cut loose by the submarine and the cutter's arrival. However, there is no evidence that the water taken on during that interest caused any damage because it did not reach the depth previously in the boat at the time of boarding by the sub's boarding party. Therefore, what damage can be

shown to result from any negligence of the Navy? Arrival back at Canaveral at 0430 hours in the morning vis-a-vis 0700 hours would not have obviated any damage nor is any shown to have occurred by the slight delay in taking the boat to Port Canaveral. Consequently, any negligence of the Navy in failing to call the Coast Guard at the time it commenced de-watering operations is negligence without substance because no damage resulted.

As we have previously seen, the Navy is not entitled to any damages on its salvage claim because it failed to prove any.

Therefore, neither side has shown any entitlement to damages and both the plaintiff and the counterplaintiff take nothing by their suits and each bears its own costs. Judgment to be entered accordingly.