IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-41358
_____


UNITED STATES OF AMERICA; ET AL.,

Plaintiffs,

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EX-USS CABOT/DEDALO, etc.,

Defendant,

MARINE SALVAGE & SERVICES, INC.,

Intervenor Plaintiff-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

July 1, 2002

Before JONES, WIENER, and PARKER, Circuit Judges.

WIENER, Circuit Judge:

Intervenor Plaintiff-Appellant Marine Salvage & Services, Inc. ("Marine Salvage"), which asserted a lien for marine necessaries against the Ex-U.S.S. Cabot/Dedalo ("the Cabot"), appeals from the district court's ruling that Plaintiff-Appellee the United States of America ("the government") has a salvage lien against the same ship, priming Marine Salvage's lien. We hold that the government cannot assert a salvage claim in the circumstances of this case,

and therefore reverse and remand.

## I. FACTS AND PROCEEDINGS

The Cabot was the last remaining light aircraft carrier (CVL) that saw service in the Pacific Theater during World War II. After the war, the Navy used the Cabot for training, decommissioned her, mothballed her, and first lent and then sold her to Spain, which renamed her the Dedalo. In 1989, the U.S.S. Cabot Dedalo Museum Foundation, Inc. (the "Foundation"), a non-profit corporation, acquired the Cabot and moved her to New Orleans, with a view to establishing an on-board museum and docking her permanently in Kenner, Louisiana. The Foundation removed the Cabot's screws, winterized her engines, and stripped the ship of most of her operational equipment.

By 1993, the Foundation had moored the unmanned Cabot on the east bank of the Mississippi in New Orleans, at the Press Street Wharf (the "Wharf"), which is owned by the Board of Commissioners of the Port of New Orleans (the "Dock Board"), a state agency. After the mayor of Kenner withdrew the offer of a mooring site for the Cabot museum, the Dock Board requested that the Foundation either move the ship from the Wharf or begin to pay dockage fees, which the Dock Board had previously waived. In March 1994, the Dock Board sued to evict the Cabot from the Wharf. As of April 1996, however, the Cabot was still moored at the Wharf.

In that month, Captain G.D. Marsh of the United States Coast Guard, the Captain of the Port of New Orleans, wrote to inform the

2

Foundation "that the dilapidated condition of the wharf and the unsatisfactory condition of the vessel's moorings pose an immediate threat to the safety of the port," given the approach of hurricane season. Exercising his authority under 33 U.S.C. Chapter 25 to ensure the safety of the Port, Captain Marsh ordered the Foundation to move the Cabot to a safer berth by the first of June.

The Foundation did nothing, so Captain Marsh wrote again, this time stating that he "plan[ned] to pursue a civil penalty" against the Foundation and that the Coast Guard would thereafter "conduct all response activities" under 33 U.S.C. § 1321(c)(1) — a provision of the Federal Water Pollution Control Act ("FWPCA") — including stabilization, threat abatement, and oil and hazardous material removal. Captain Marsh added that the Coast Guard would invoice the Foundation for expenses incurred in these activities, whereupon the Foundation filed for protection in bankruptcy. In July, Captain Marsh informed the Foundation that the Coast Guard had removed chemical drums and some oil from the Cabot and had upgraded her mooring at the Wharf by installing hurricane moorings. He ordered the Foundation to continue monitoring the Cabot's moor.

Almost a year later, as the bulk carrier M/V Tomis Future was steaming downriver, her pilot brought her too close to the east bank, and she allided[1] with the Cabot, substantially damaging both

---

[1]A vessel allides if, while under way, it runs into a stationary vessel. BLACK'S LAW DICTIONARY 69 (5th ed. 1979) (defining "allision").

the Cabot and the Wharf.  The owner of the Tomis Future called out emergency response tugs to berth that vessel and to secure the Cabot against the Wharf.  After Commander Daniel Whiting, the Coast Guard's Chief of Port Operations, inspected the damage, the Coast Guard again became concerned for the safety of the Cabot's moor, particularly because the Mississippi was running high.  Three days after the allision, Captain Marsh issued another order under 33 U.S.C. Chapter 25, requiring the Foundation to hire a tug to stand by the Cabot and, within three days, to move the Cabot "to a safe hurricane mooring site" or a "robust hurricane mooring location." The next day, the owner of the Tomis Future took his tugs off hire and his vessel departed the port (without posting adequate security).

The Foundation did not call out a tug of its own, so Captain Marsh immediately notified the Foundation that the Coast Guard "assumed responsibility for providing the assist tug to properly maintain the safety of the vessel."  He also wrote that the Coast Guard did so "in accordance with 33 USC 1321(c)" and that it would seek reimbursement under 33 U.S.C. § 1321(f), both referenced subsections being provisions of the FWPCA.  Under this authority, the Coast Guard hired tugs to stand by the Cabot for seven weeks, at the end of which Captain Marsh again wrote to the Foundation, advising that the Coast Guard had completed preparations "to move the vessel to a safe hurricane mooring" under the authority of 33 U.S.C. § 1321(c).  The Coast Guard then shifted the Cabot from the

4

Wharf to Violet, Louisiana, some forty miles downstream.  This move (including the seven weeks' tug service, at about $5,000 per day, and post-allision repairs to the moor) cost the Coast Guard and the National Pollution Funds Center[2] $500,868.94.

In October of that year (1997), the Cabot made a dead-ship move from Violet to Port Isabel, Texas.  At approximately the same time, the Foundation sold the Cabot.  Under contract with the new owner, Marine Salvage provided wharfage and security services to the ship in Port Isabel.  Later, when the Cabot began to list in her berth, Marine Salvage acted to prevent her from capsizing, at a cost of $20,908.00.

The following year, Marine Salvage and others sued the Cabot in rem in the Southern District of Texas.  Several months later, the government sued the Cabot, also in rem.  The Cabot was arrested both times, but was released when those suits were dismissed.

The government again sued the Cabot in 1999, and the district court for the Southern District of Texas arrested the Cabot for a third time.  Other claimants intervened, including (1) the Dock Board, which sought in rem enforcement of an in personam judgment against the Foundation rendered by the district court for the Eastern District of Louisiana; and (2) Marine Salvage, which sought to recover on both a salvage lien and a lien for necessaries.  The

---

[2]The National Pollution Funds Center administers the Oil Spill Liability Trust Fund, which pays for certain costs of removing discharges of oil or mitigating substantial threats of discharge. See 33 U.S.C. § 1321(s) (2000).

5

district court in Texas authorized the U.S. Marshal to auction the Cabot. At the marshal's sale, a shipwrecker bid and subsequently paid $185,000 for the Cabot, about half of which was paid to its substitute custodian and to the U.S. Marshals Service, leaving $91,250.68 (plus interest) to be distributed to other claimants. The government, Marine Salvage, and the Dock Board asserted lien claims to the funds that remained in the registry of the district court. Following a trial to determine the priority and amounts of the liens, the district court held that Marine Salvage had a valid salvage lien of $20,908.00 with priority over a valid salvage lien of the government, which in turn was entitled to the balance of $70,342.68 that would remain in the court's registry after paying Marine Salvage. As the government's salvage lien exhausted the deposited funds, the district court did not evaluate the merits or priorities of the $56,872.39 lien for necessaries asserted by Marine Salvage or the $399,685.48 lien for necessaries asserted by the Dock Board. This appeal followed.

## II. ANALYSIS

Marine Salvage contends that (1) the Coast Guard cannot make a salvage claim for the actions it took under the authority of 33 U.S.C. § 1321; (2) the district court clearly erred in finding "marine peril" to the Cabot; and (3) the district court abused its discretion in calculating a salvage award based on the Coast Guard's costs, which Marine Salvage contends were unreasonable. As we agree with Marine Salvage's first contention, we do not reach

6

the issues of marine peril or award calculation.

A.    Standard of Review in Salvage Cases

In appeals of admiralty cases, as in most other cases, we review a district court's factual findings for clear error and its conclusions of law de novo.[3]  "A [factual] finding is clearly erroneous when, although there is evidence to support it, the reviewing court based on all of the evidence is left with the definite and firm conviction that a mistake has been committed."[4] As the Supreme Court has stated, however, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[5]  Assessing the credibility of witnesses is a task exclusively for the trier of fact.[6]

The doctrine of salvage is settled.  "A successful salvage claim requires three proofs: (1) marine peril; (2) voluntary service rendered when not required as an existing duty or from a special contract; and (3) success in whole or in part, or

---

[3]Bargecarib Inc. v. Offshore Supply Ships Inc., 168 F.3d 227, 229-30 (5th Cir. 1999); Nunley v. M/V Dauntless Colocotronis, 863 F.2d 1190, 1196 (5th Cir. 1989); FED. R. CIV. P. 52(a).

[4]Walker v. Braus, 995 F.2d 77, 80 (5th Cir. 1993).

[5]Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985); accord, Harrison v. Flota Mercante Grancolombiana, S.A., 577 F.2d 968, 976 (5th Cir. 1978) ("It is not our duty or right on appeal to sift through the evidence and determine whether we would have drawn the same inferences as did the trier of fact and would have resolved credibility determinations in a like fashion.").

[6]Anderson, 470 U.S. at 575; Black Gold Marine, Inc. v. Jackson Marine Co., 759 F.2d 466, 470 (5th Cir. 1985).

contribution to the success of the operation."[7]  The instant case turns on the voluntariness prong, which is ordinarily an issue of fact.[8]  Here, however, the question of voluntariness is also presented, in two ways, as an issue of law.  First, the district court's analysis of the voluntariness question was grounded in a precedent of ours, and to that extent was a legal analysis.  We review de novo a district court's interpretation of our cases.  Second, the trial court's voluntariness determination also turned on identifying and interpreting the provisions of law under which the Coast Guard acted; and statutory interpretation too is a question of law that we review de novo.[9]

B.  The District Court's Legal Analysis

The district court analyzed the Coast Guard's claim as follows (notes in original):

> The services rendered to salve a vessel cannot be performed pursuant to a preexisting duty or contract.  In other words, an individual's efforts to protect a vessel from peril must be voluntary.  See The SABINE, 101 U.S. 384 (1879)....  Actions taken pursuant to a duty owed to a third party are voluntary.  Hence, when the Coast Guard salves a vessel, its actions are generally voluntary because its statutory mandate exists to protect the public, not the vessel or its owner.  See In re American

---

[7]Nunley, 863 F.2d at 1200.  See The "Sabine", 101 U.S. 384, 384 (1880).

[8]Nunley, 863 F.2d at 1201 (treating the question whether a ship's master acted in a contractual or personal capacity, for purpose of voluntariness determination, as an issue of fact).

[9]Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999).

8

<u>Oil Co.</u>, 417 F.2d 164, 169 (5th Cir. 1969).[10] In addition, the Fifth Circuit indicated in dicta in <u>In re American Oil</u> that the Coast Guard has discretion whether to act and therefore its services are rendered voluntarily.[11] <u>Id.</u> at 168. A later district court case adopted this statement and held that the Coast Guard can be reimbursed for its salvage efforts. <u>See</u> <u>DFDS Seacruises (Bahamas) Ltd. v. United States</u>, 676 F.Supp. 1193, 1200 (S.D.Fla.1987) (characterizing the rule that Coast Guard rescue services are voluntary as "well-settled").[12]

...

Like Marine Salvage, the United States has a valid salvage lien. It acted to avert a real risk to the Cabot after the M/V Tomis Future collided with the vessel in New Orleans. If the Coast Guard had not repaired the Press Street Wharf and positioned tugboats alongside the Cabot, there was a significant possibility that the Cabot would have broken free on the Mississippi [R]iver and been destroyed or severely damaged. The Coast Guard acted voluntarily because the owner of the vessel, at

---

[10][Note 28 in original:] <u>See also</u> <u>Kelly v. United States</u>, 531 F.2d 1144, 1147 (2d Cir.1976) (stating that Coast Guard's salvage efforts are voluntary in context of a negligence claim alleged against the Coast Guard); <u>United States v. DeVane</u>, 306 F.2d 182, 186 (5th Cir.1962) (stating that Coast Guard's salvage endeavors are voluntary in the context of determining the Coast Guard's duty to those who relied on the rescue); <u>In re Sincere Nav. Corp.</u>, 327 F.Supp. 1024, 1025 (E.D.La.1971) (citing <u>In re American Oil</u> with approval, but denying the government's salvage claim on other grounds); <u>Markakis v. S/S Volendam</u>, 486 F. Supp. 1103, 1109 (S.D.N.Y.1980) (stating that the Coast Guard has no pre-existing duty in dicta). <u>Cf.</u> 3A BENEDICT ON ADMIRALTY § 78 (7th ed.1997).

[11][Note 29 in original:] The Fifth Circuit in <u>In re American Oil Co.</u> cites 14 U.S.C. § 88 for the proposition that the Coast Guard's actions were permissive. Section 88(b) states that "the Coast Guard may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized." 14 U.S.C. § 88(b).

[12][Note 30 in original:] <u>Cf.</u> <u>Port Tack Sailboats, Inc. v. United States</u>, 593 F.Supp. 597, 599 n. 2 (S.D.Fla.1984) (stating in dicta that traditionally the Coast Guard cannot recover for rescue services and stating that the Fifth Circuit's statement in <u>In re American Oil</u> was dictum).

that time the U.S.S. Cabot Dedalo Museum Foundation, stood by and refused to act in an emergency situation, and [the Coast Guard] had no pre-existing legal duty to act.[13]

## C. In re American Oil Co.[14]

The district court appears to have concluded, and the government contends vigorously on appeal, that in American Oil, we departed from the traditional rule that because the Coast Guard acts out of a duty, its actions are not voluntary, and it therefore cannot bring a salvage claim.[15]  A brief analysis of American Oil shows that this view of our precedent is incorrect.

In American Oil, a tanker moored dockside in the Houston Ship Channel and laden with six million gallons of gasoline and heating

---

[13]United States v. Ex-USS Cabot/Dedalo, 179 F. Supp. 2d 697, 709–11 (S.D. Tex. 2000).

[14]In re American Oil Co. 417 F.2d 164 (1969).

[15]For the traditional rule, see United States v. Central Wharf Towboat Co., 3 F.2d 250, 251–52 (1st Cir. 1924) ("The cutter, being a government boat, was not entitled to pay for its services and the coast guard and power boat made no claim, and, so far as appears, stood in no better position to make the claim than the cutter."); The Kanawha, 254 F. 762, 764 (2d Cir. 1918) ("The Lady Laurier and Androscoggin being government property, no claim was made for their services."); In re Sincere Navigation Corp., 327 F. Supp. 1024, 1026 (E.D. La. 1971) (stating that "traditionally, recovery has not been permitted the United States for the governmental services it provides," and emphasizing that the Navy and Air Force have a statutory right of salvage recovery); Puget Sound Tug & Barge Co. v. Waterman S.S. Corp., 98 F. Supp. 123, 128 (N.D. Cal. 1951) ("The Coast Guard cutters...have not claimed, nor are they entitled under the law to claim[,] any pay for their share in the operation."). See also GUSTAVUS H. ROBINSON, HANDBOOK OF ADMIRALTY LAW IN THE UNITED STATES § 102 at 761–62 (1939).

oil caught fire and was in danger of exploding.[16] Firefighters from Houston, eighteen other cities and towns, and three Coast Guard stations battled the blaze from midnight into the next morning, when they ran out of the kind of foam required to fight petrochemical fires.[17] The Coast Guard was forced to buy more foam from remotely located commercial sources and have it flown to Houston on Air Force and Navy planes.[18] In thus assisting the Coast Guard, the Air Force and Navy incurred expenses totaling $89,676.60.[19] The government presented, and the district court approved, a salvage claim in that amount, which did not include any charges for the direct costs incurred by the Coast Guard.[20] We upheld the award, noting both that Congress had expressly authorized the Air Force and the Navy to make salvage claims[21] and that local firefighting units, rather than the Coast Guard, bore the primary legal responsibility for fighting dockside fires.[22] Therefore, we reasoned, the government could recover the expenses

---

[16]American Oil, 417 F.2d at 165.

[17]Id. at 165–66.

[18]Id. at 166.

[19]Id. at 166, 170.

[20]American Oil, 417 F.2d at 167.

[21]Id. at 169. We cited to 10 U.S.C. §§ 7365 (Navy) & 9804 (Air Force). Section 7365 has since been reenacted as 10 U.S.C. § 7363 (2000).

[22]American Oil, 417 F.2d at 168.

11

for salvage services rendered by the Air Force and the Navy to the Coast Guard in aid of its providing assistance to the vessel.[23]

Our American Oil opinion went further than was required to decide that case, however. We concluded from the relevant statutory language,[24] which we regarded as permissive and not mandatory,[25] that the Coast Guard had discretion whether to aid persons and save property in peril. Possibly inadvertently, we then opened the door to the Coast Guard's future assertion of salvage claims:

> [T]he National Government has apparently concluded as a matter of policy to make a salvage claim for services rendered by the U.S. Coast Guard to the extent, and only to the extent, that the Coast Guard used the services and supplies of the Air Force and Navy. This does not mean that the Coast Guard has no right to salvage for its own services and supplies. The pre-existing duty bar to salvage by the U.S. Coast Guard has not been sustained by the Courts.[26]

This passage, clearly dictum, has had a mixed reception among courts and commentators. Some courts — perhaps including the district court in this case — have correctly recognized that our American Oil discussion of the Coast Guard's entitlement to assert

---

[23]Id. at 170.

[24]See 14 U.S.C. § 88(a) & (b), which state that the Coast Guard "may," rather than shall, perform rescue duties. But see 14 U.S.C. § 2 ("Primary Duties") (stating that the Coast Guard "shall develop, establish, maintain, and operate...rescue facilities for the promotion of safety on...the high seas and waters subject to the jurisdiction of the United States") (emphasis added).

[25]American Oil, 417 F.2d at 168–70.

[26]Id. at 167–68.

12

a salvage claim was <u>dictum</u>.[27]   Other courts — rather inexplicably,

given the reasoning and facts of <u>American Oil</u> — have viewed it as

a holding.[28]   Furthermore, the "old rule" against salvage recovery

for the Coast Guard still finds considerable support among authors

of admiralty treatises, who urge that the Coast Guard ought not

usually be permitted to assert a salvage claim.[29]   For present

[27]<u>Ex-USS Cabot/Dedalo</u>, 179 F. Supp. 2d at 710; <u>Port Tack Sailboats, Inc. v. United States</u>, 593 F. Supp. 597, 599 n.2 (S.D. Fla. 1984):

> Traditionally, [the] United States Coast Guard provides rescue services pursuant to its statutory mission and does not act therefore as a volunteer. 14 U.S.C. § 88, BENEDICT ON ADMIRALTY Vol. 3A, § 59 (7th Ed. 1980); Gilmore and Black, THE LAW OF ADMIRALTY, 540 (2d Ed.); *Beach Salvage Corp. of Florida v. The Captain Tom,* 201 F. Supp. 479 (S.D.Fla.1961); THE LYMAN M. LAW, 122 F. 816 (D.Me.1903). However, [the] Fifth Circuit Court of Appeals specifically pointed out that the Coast Guard is not barred from salvage claims for its own services and supplies in *United States v. American Oil Co.,* 417 F.2d 164 (5th Cir.1969), *cert. denied,* 397 U.S. 1036, 90 S.Ct. 1353, 25 L.Ed.2d 647 (1970) however [sic], the language of the Fifth Circuit was completely dictum....

[28]<u>DFDS Seacruises (Bahamas) Ltd. v. United States</u>, 676 F. Supp. 1193, 1200–01 (S.D. Fla. 1987) (relying on <u>American Oil</u> as binding precedent); <u>Markakis v. S/S Volendam</u>, 486 F. Supp. 1103, 1109 n.21 (S.D.N.Y. 1980) (citing <u>American Oil</u> as supporting the proposition that "The 'pre-existing duty' exception has been considerably narrowed in modern cases; for example, Coast Guard personnel performing rescue tasks in the line of duty are deemed voluntary actors whose services may generate salvage awards").

[29]<u>See</u> 3A MARTIN J. NORRIS, BENEDICT ON ADMIRALTY: THE LAW OF SALVAGE § 78 (1991) (interpreting the result of <u>American Oil</u> as confined to fires taking place primarily within the jurisdiction of local firefighting services) ("The determination and disposition of [<u>American Oil</u>] by the Fifth Circuit does not mean...that the Coast Guard would have entitlement to a salvage award for rescue activities to distressed marine property and of persons on the high seas."); 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 16-3 at 362 (3d ed. 2001) ("Even the Coast Guard may qualify for salvage in the

13

purposes it suffices that <u>American Oil</u>'s discussion of the Coast Guard's ability to bring salvage claims was <u>dictum</u> and therefore provides no jurisprudential support for the district court's holding on this issue.  Whether, as a general proposition, the Coast Guard may bring a salvage claim remains an open question in this Circuit; we need not address it here and therefore reserve it for a later day.

D.    <u>Statutory Developments: FWPCA</u>

In opposition to this <u>dictum</u>, argues Marine Salvage, stands positive law.  As a general rule, court-made admiralty law applies only in the absence of relevant federal statutory law.[30]  Thus, even

---

case of extraordinary efforts...[citing to <u>American Oil</u> only]; but there are no grounds for an award for performance of its usual duties of going to the aid of distressed vessels."); CHARLES M. DAVIS, MARITIME LAW DESKBOOK 480 (2001) ("Normally, the services of the Coast Guard, municipal firemen, and others who are under a duty to provide emergency services to a vessel, are not considered to be 'voluntary.'").  <u>Compare</u> GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 8-5 at 551 (2d ed. 1975):

> The [Fifth Circuit]...went out of its way to construct a rationale which permits the Coast Guard to claim salvage whenever it chooses.  The result appears eminently sound when the property saved belongs to a large corporation whose own corporate activities created the peril in the first instance.  There is no reason to believe that the Coast Guard, under the Fifth Circuit dispensation, will make salvage claims for the rescue of small fishing boats or privately owned yachts.

<u>with</u> HERBERT R. BAER, ADMIRALTY LAW OF THE SUPREME COURT § 20-8 at 598 (3d ed. 1979) ("By statute the Coast Guard is charged with the duty of aiding vessels in distress and in providing rescue services.  Consequently, Coast Guard personnel engaging in rescue or salvaging services are only performing their duty and are not entitled to salvage.").

[30]<u>East River S.S. Corp. v. Transamerica Delaval Inc.</u>, 476 U.S. 858, 864 (1986).

if here we were to assume without granting that in other circumstances the Coast Guard could assert a salvage claim, this case requires only that we address how that putative common-law right fares in the face of statutory provisions enacted since American Oil was decided.[31] For it was pursuant to these post-American Oil enactments — portions of the FWPCA — that the Coast Guard asserted it was acting to secure the Cabot. Examination of those FWPCA provisions reveals that they expressly require the Coast Guard to abate threats of oil pollution. For the district court to conclude that the Coast Guard had no pre-existing duty to act in this case was therefore legal error.

The FWPCA declares a national policy that "there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States."[32] To effect this policy, says the statute, the President "shall prepare and publish a National Contingency Plan ["NCP"] for removal of oil."[33] The FWPCA mandates that the NCP "shall provide for efficient, coordinated,

---

[31]One such statute, the Oil Pollution Act of 1990, Pub. L. No. 101-380, 104 Stat. 486 (1990), codified principally at 33 U.S.C. §§ 2701–2761 (2000), contains a detailed and comprehensive scheme governing liability for oil-pollution prevention and cleanup. See 33 U.S.C. §§ 2701–2720. The parties dispute whether this scheme preempts the common law of admiralty, including salvage, and provides the government its exclusive remedy in this case. We do not reach this issue, as we determine for other reasons that the government cannot bring a salvage claim in this case.

[32]33 U.S.C. § 1321(b)(1) (2000).

[33]33 U.S.C. § 1321(d)(1) (2000).

15

and effective action to minimize damage from oil and hazardous substance discharges" and "shall include"

> (C) Establishment or designation of Coast Guard strike teams, consisting of——
>> (i) personnel who shall be trained, prepared and available...to carry out the National Contingency Plan;
>> (ii) adequate...pollution control equipment and material; and
>> (iii) a detailed oil and hazardous substance pollution and [sic] prevention plan.[34]

"[A]ctions to minimize damage from oil and hazardous substance discharges shall...be in accordance with" the NCP.[35] The Secretary of Transportation "shall establish in each Coast Guard district a Coast Guard District Response Group," which "shall consist of the Coast Guard personnel and equipment...of each port within the district."[36] The FWPCA further mandates that the NCP shall designate "the Federal official who shall be the Federal On-Scene Coordinator" for each port or harbor area."[37] The mandatory "shall" is ubiquitous in the FWPCA.

These and other provisions[38] of the FWPCA make abundantly clear

---

[34] 33 U.S.C. § 1321(d)(2) & (d)(2)(C) (2000).

[35] 33 U.S.C. § 1321(d)(4) (2000).

[36] 33 U.S.C. § 1321(j)(3)(A) & (B) (2000). The Response Groups "shall provide technical assistance, equipment, and other resources when required by a Federal On-Scene Coordinator." 33 U.S.C. § 1321(j)(3)(C) (2000).

[37] 33 U.S.C. § 1321(d)(2)(K) (2000).

[38] See 33 U.S.C. § 1321(c)(1)(A) (2000) ("The President shall, in accordance with the National Contingency Plan..., ensure effective and immediate...mitigation or prevention of a substantial

16

that the Coast Guard's duty to respond to a threatened oil spill is mandatory, not optional.  Many of these mandatory provisions were enacted in 1990, in the wake of the Exxon Valdez oil spill in Alaska, and embody a congressional policy that the Coast Guard must respond swiftly and effectively to threatened oil spills.  The Coast Guard therefore cannot forthrightly analogize its pollution-prevention plan and mission to its search-and-rescue plan and mission, which we determined in American Oil to be permissive or optional —— not required or mandatory —— for the purposes of a salvage analysis.[39]

The government also advances a privity argument grounded in American Oil: that the "pre-existing duty which can disqualify a salvor from recovering must run between the salvor and the owner of the vessel and cargo salved."[40]  This is only a partial statement of the law, however: As one leading treatise puts it, the pre-existing duty to act can also arise

from the nature of the salvor's employment, for example,

threat of a discharge."); 33 U.S.C. § 1321(c)(2)(A) (2000) ("If...a substantial threat of a discharge...is of such a size or character as to be a substantial threat to the public health or welfare of the United States...the President shall direct all Federal...actions to...mitigate or prevent the threat of the discharge."); 33 U.S.C. § 1321(c)(3)(A) (2000) ("Each Federal agency...shall act in accordance with the National Contingency Plan or as directed by the President.").

[39]American Oil, 417 F.2d at 169–70.  We also observed that the search-and-rescue plan did not encompass salvage operations.  Id. at 170.

[40]Id. at 169.

> salvage by firemen, pilots, or public officers and
> employees.
>     The general rule in such cases is that such persons
> are not entitled to a salvage award if the services were
> performed in the line of their assigned duties. . . .
> Firemen, pilots, and other public employees and service
> personnel may qualify for an award only where their
> service is outside the line of their official duties.[41]

Yet even if we were to read American Oil overbroadly and decide that the Coast Guard is an exception to the rule that salvage is within the regular duties of public officers, the Coast Guard's § 1321 general duties to protect the public health and safety obviously included preventing an oil spill from the Cabot. We are not persuaded by the government's argument that even if the Coast Guard was acting under § 1321, as it declared repeatedly at the time, it still acted voluntarily and therefore may bring a salvage claim.

E.   Nature of Coast Guard's Actions vis-á-vis the Cabot

Having established the legal principle that the Coast Guard had a mandatory duty to abate potential threats of oil pollution, we now address the final question in our analysis of voluntariness: Did the Coast Guard actually act here as a salvor or as a pollution abater? The evidence demonstrates, beyond question, that Captain Marsh and Commander Whiting acted under the FWPCA and not as salvors. Captain Marsh consistently cited 33 U.S.C. § 1321 in his letters to the Foundation. Commander Whiting testified that he was the representative of the On-Scene Coordinator established by

---

[41]SCHOENBAUM, supra note 29, § 16-3, at 362 (citations omitted).

18

§ 1321, and that the Coordinator — Captain Marsh — "was operating under the National Contingency Plan" in mitigating the threat posed by the Cabot.  Commander Whiting's deposition also included the following exchange:

> Q    What permission did the Coast Guard get or need from the Museum Foundation to take the actions it took?
> A    No permission from the Foundation.  The on-scene coordinator in this particular place, acting to abate substantial [sic] threat to public safety, took action required of him under the National Contingency Plan.  He doesn't have a choice to act.  He has a duty to act.
> Q    Why were the tugs required to stand by the Ex-USS CABOT after the allision?
> A    . . .
>      It was the continued determination by the Captain of the Port, by the on-scene coordinator Captain Marsh, that assistance continued to be required on the CABOT.

The United States tries to trivialize this testimony as that of a non-lawyer, and also argues that a servicemember's perceptions of his duty do not bind the Coast Guard.  The government's arguments are not convincing.  This testimony, and the letters sent to the Foundation, accurately invoked or described mandatory provisions of the FWPCA which applied perfectly to the context.  Captain Marsh and Commander Whiting expressed that they were acting pursuant to mandatory statutory provisions in § 1321; the Coast Guard told the Foundation it was doing so; and the Coast Guard indisputably exercised its authority under that statute when it took control of the Cabot.

G.    Forced Assistance

19

There is yet another reason why salvage is not available to the Coast Guard in the circumstances of this case. If the Coast Guard had asserted from the beginning that it was salving the Cabot, the Foundation, if it so desired, could have forestalled the attempt. Under the doctrine of salvage, an owner in possession of a vessel may refuse proffered help and thereby deny a salvage claim to the would-be salvor.[42] When the Coast Guard took the actions that it now attempts to describe as salvage operations, it announced specifically that it was taking them pursuant to statutes that give it broad authority to mitigate oil pollution threats, even unto seizing or destroying vessels. By forcing its assistance on the Foundation under authority of the statutes, thereby avoiding the possibility of denial of salvage by the Foundation, the Coast Guard destroyed any semblance of the hypothetical market for rescue services that the salvage doctrine is designed to replicate.[43] Having done so, in the process avoiding the possibility of denial

---

[42]Merritt & Chapman Derrick & Wrecking Co. v. United States, 274 U.S. 611, 613 (1927) ("[S]alvage cannot be exacted for assistance forced upon a ship.") (citing The Bolivar v. The Chalmette, 1 Woods C.C. 397); NORRIS, supra note 29, §§ 114–16; GILMORE & BLACK, supra note 29, § 8-2, at 536.

[43]See Margate Shipping Co. v. M/V Ja Orgeron, 143 F.3d 976, 986 (5th Cir. 1998) ("[T]he law of salvage aims to create a post-hoc solution that will induce the parties to save the ship without first agreeing on terms."). Margate also quotes William M. Landes & Richard A. Posner, Salvors, Finders, Good Samaritans, and Other Rescuers: An Economic Study of Law and Altruism, 7 J. LEGAL STUD. 83, 100 (1978) for the proposition that "[T]he purpose of salvage awards is to encourage rescues in settings of high transaction costs by simulating the conditions and outcomes of a competitive market." Margate, 143 F.3d at 986.

of salvage by the ship owner, the Coast Guard cannot now be heard to claim the role of salvor.

## III. CONCLUSION

The Coast Guard cannot seek salvage recovery for actions unquestionably taken pursuant to mandatory provisions of the FWPCA. The district court erred as a matter of law in deriving a contrary rule from American Oil and relevant statutes. As a factual matter, the evidence —— particularly the Coast Guard's own contemporaneous declarations that it was proceeding under § 1321 —— leads inescapably to the conclusion that in this instance, the Coast Guard acted on its mandatory duty under the FWPCA, not as a voluntary rescuer. The district court therefore clearly erred in concluding that the Coast Guard acted voluntarily and may now make a salvage claim. We are constrained, therefore, to reverse the court and remand this case to it for further consistent proceedings.

REVERSED and REMANDED.